IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STEVEN J. RIZZI and ROBOCAST, INC., | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Misc. Action No. 24-202-CJB |
| | ) |
| NETFLIX, INC., | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM ORDER

Before the Court in this miscellaneous action is a motion to quash subpoenas ("motion to quash") and for sanctions ("motion for sanctions") filed by Petitioners Steven J. Rizzi ("Mr. Rizzi") and Robocast, Inc. ("Robocast," and together with Mr. Rizzi, "Petitioners") pursuant to Federal Rule of Civil Procedure 45 (the "Motion"). (D.I. 1) The Court reviewed the Motion and the initial briefing thereto, (D.I. 3; D.I. 15; D.I. 32), and it then heard argument on the Motion on July 22, 2024, (D.I. 61 (hereafter, "Tr.")). Thereafter, the Court ordered necessary supplemental briefing on the Motion. (D.I. 55; D.I. 57) Having now also reviewed that supplemental briefing (including the hundreds of pages of deposition testimony and other exhibits that were cited in those supplemental briefs), and having considered Rule 45(d) and the relevant legal standards, the Court ORDERS as follows:

1. Here the subpoenas at issue (for documents and for deposition testimony) are directed to Mr. Rizzi, (D.I. 2, ex. A); Mr. Rizzi serves as one of Robocast's lead trial counsel in a related patent infringement litigation in this Court against Respondent Netflix, Inc. ("Respondent" or "Netflix"), s*ee Robocast, Inc. v. Netflix, Inc.*, Civil Action No. 22-305-JLH (D. Del.). Netflix asks that the Court employ the factors set out in *Shelton v. Am. Motors Corp.*, 805 F. 2d 1323 (8th Cir. 1986) (the "*Shelton* factors") to review its subpoena requests—noting that our Court has

regularly applied the *Shelton* factors when assessing the appropriateness of discovery requests served on opposing trial counsel. (D.I. 55 at 1; *see also* D.I. 15 at 19 n.13); *see also Ricoh Co. v. Oki Data Corp.*, C.A. No. 09-694-SLR, 2011 WL 3563142, at *2 (D. Del. Aug. 15, 2011); *Allergan Inc. v. Pharmacia Corp.*, No. Civ.A.[ ]01-141-SLR, 2002 WL 1268047, at *1 (D. Del. May 17, 2002); *Smith ex rel. Smith v. United States*, 193 F.R.D. 201, 215 (D. Del. 2000). Petitioners, for their part, do not oppose use of the *Shelton* factors. And so the Court will employ the rigorous *Shelton* standard in assessing Rule 45(d) and in resolving the Motion here.

2.  *Shelton* recognized that discovery requests served on opposing litigation counsel "should be employed only in limited circumstances" because such requests are a "negative development in the area of litigation" for various reasons. *Shelton*, 805 F. 2d at 1327. In light of this, such discovery may only proceed where a party seeking discovery from its opposing side's counsel can show that: "(1) no other means exist to obtain the information than to [get it from] opposing counsel . . . ; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Id.* (internal citation omitted).

3.  By the time of its supplemental briefing, Netflix distilled down the categories of information it was seeking from Mr. Rizzi[1] to four: i.e., those reflecting: (a) his knowledge of Robocast's patent licensing activity; (b) his personal investment in Robocast's affiliate; (c) his communications regarding investments and/or litigation funding; and (d) his involvement in patent prosecution history-related issues (including those relating to Netflix's inequitable

---

[1] The document subpoena itself includes an unwieldy and incredibly broad list of 42 document requests. (D.I. 2, ex. A) And so this narrowing was much needed.

conduct and/or prosecution laches defenses). (D.I. 55; *see also* Tr. at 11, 33-37) Therefore, the Court will address these four categories herein in resolving the motion to quash.

        4.        With regard to Netflix's request for information relating to Mr. Rizzi's knowledge of Robocast's patent licensing activity, that request is denied, and so Petitioners' Motion is GRANTED in this respect. There has been no clear showing that Mr. Rizzi had unique knowledge as to this subject matter. If anything, the record suggests the opposite. Robocast's in-house counsel and Federal Rule of Civil Procedure 30(b)(6) witness on licensing matters, Brett Smith, was able to testify about Robocast's licensing efforts generally, (D.I. 57 at 1 (citing Mr. Smith's testimony in this regard)); to the extent that Mr. Smith could not recall certain information regarding those efforts, he indicated he could later obtain that information if needed, (*see, e.g.*, *id.*, ex. A at 256). And although there were a few snippets of testimony suggesting that Mr. Rizzi was likely part of communications with actual or potential licensees, (*id.* at 282-84; D.I. 55, ex. 2 at 19-20), is not clear from the record that Mr. Rizzi would have been the only Robocast representative to participate in or know about those contacts, (D.I. 57, ex. A at 282-284). Even if he was, Mr. Rizzi would not likely have *unique* knowledge about the content of any such communications—since the third party licensees should also know what was said or communicated (with such communications potentially also being reflected in Robocast's or the third party's documents). (Tr. at 55; D.I. 57, ex. A at 283-84 (Mr. Smith noting that Yahoo! and Daily Motion were two companies who responded to Mr. Rizzi's outreach regarding licensing)); *cf. Patrick v. Equifax Info. Servs., LLC*, Civil No. 23-4092 (CPO)(EAP), 2024 WL 4404187, at

\*7 (D.N.J. Oct. 3, 2024); *M & R Amusements Corp. v. Blair,* 142 F.R.D. 304, 306 (N.D. Ill. 1992).[2]

5.  With regard to Netflix's request for information relating to Mr. Rizzi's personal investment in Robocast's affiliate, it is denied, and so the Motion is GRANTED in this respect. In February 2008, Mr. Rizzi made a small investment in the affiliate, Interactive Media Universe ("IMU"). This investment amounted to a less than 0.5% ownership interest in IMU and less than a 0.25% interest in Robocast; the investment was repurchased by IMU in 2010. (D.I. 55, ex. 4 at ¶¶ 10-12; *see also id.*, ex. 3 at 513-14 (Robocast CEO and inventor of the asserted patents Damon Torres noting that while the amount of money invested was small, the investment was still "substantial" to him—in the sense that it came at an important time in the company's development); D.I. 27, ex. 9) The Court agrees with Netflix that Mr. Rizzi likely does have some unique knowledge about this investment, such as about his own "reasons for investing" and how he personally valued Robocast at that time. (D.I. 55 at 1; *see also* D.I. 15 at 17-18); *cf. Ricoh Co.*, 2011 WL 3563142, at \*2 (noting that an attorney could have unique knowledge where only he "could explain what he meant and provide the basis for his conclusions"). Petitioners make no assertion that such information would be privileged. As to relevance, while the Court wishes that Netflix had provided a better explanation on this front, it thinks it can see how an investor's valuation of Robocast (including the value of Robocast's intellectual property) could be relevant to the analysis of the hypothetical negotiation (and thus to damages) in the

---

[2]  To the extent that Netflix asserts that Robocast has "refus[ed] to produce [such] communications" with potential or actual licensees, (D.I. 55 at 1; *see also* Tr. at 55), Petitioners respond that if Netflix did not receive such communications in discovery, that is due to limits on the scope of discovery in the related case that Netflix itself pushed for, (D.I. 57 at 1; Tr. at 60-61). The Court has no basis to conclude that this is not so.

related case.  (D.I. 55 at 1-2; D.I. 15 at 13, 17; Tr. at 48-50)  Yet with all of that said, the Court denies the request because it cannot conclude that this information is "crucial" to the preparation of Netflix's case.  Mr. Rizzi is but one of approximately 120 people who have invested in Robocast during its existence, (Tr. at 47; D.I. 27, ex. 10), and he ultimately owned one-quarter of one percent of Robocast (and even then, only for a short time).  Netflix deposed at least one other Robocast investor, (Tr. at 41-42), and it surely could have sought discovery from other investors (including those with much more substantial stakes in the company than Mr. Rizzi's) had it had wished to.  (D.I. 57 at 1 (Petitioners asserting that Netflix chose not to subpoena "long term investors with large stakes in Robocast") (emphasis omitted); *see also* D.I. 32 at 3 n.2; Tr. at 16)  Therefore, in light of the very small nature of Mr. Rizzi's investment, and in light of Netflix's decision not to pursue similar information from more substantial Robocast investors—the Court cannot conclude that any testimony or evidence that Mr. Rizzi could provide about his investment would be "crucial" to Netflix's case.[3]  *See Nord Hodges v. Passidomo*, Case No.: 4:24mc139MW/MAF, 2024 WL 4810385, at *4 (N.D. Fla. Nov. 15, 2024) (applying *Shelton* and explaining that "crucial" information is generally understood to be information that necessary for the survival of a claim or defense, or information that itself would resolve a key or core issue in the case) (collecting cases); *Monster Energy Co. v. Vital Pharm., Inc.*, Case No. 5:18-cv-01882-JGB (SHKx), 2020 WL 2405295, at *13 (C.D. Cal. Mar. 10, 2020) (applying *Shelton* and noting

---

[3] To the extent that Netflix suggests that something about the fact that Mr. Rizzi is the only investor who was "paid on his promissory note" makes this evidence "crucial" to the related litigation matter, it did not sufficiently explain how or why that is so.  (D.I. 55 at 1; Tr. at 47-50, 61-62)

that simply because certain information may be "useful" does not mean that it is "crucial" to a party's case).

6.  As to Netflix's request for information relating to Mr. Rizzi's communications regarding investments and/or litigation funding, it is denied, and so the Motion is GRANTED in this respect. The Court has previously ruled that such communications could be relevant to the related case to the extent that they relate to the value of the patents at issue in that litigation. (Tr. at 155-57; Civil Action No. 22-305-JLH, D.I. 449 at 3 (D. Del. Jan. 8, 2025)) And the Court has ordered that relevant discovery regarding such communications be produced in that case (in line with the scope of the parties' prior discovery-related agreements). (D.I. 57 at 1-2; Tr. at 25, 57, 60, 155-57; Civil Action No. 22-305-JLH, D.I. 449 at 3 (D. Del. Jan. 8, 2025)) However, the Court cannot see how Mr. Rizzi would have unique knowledge as to any such communications. On that score, Petitioners note that as a general matter, various other Robocast representatives other than Mr. Rizzi interacted with investors and litigation funders. (D.I. 57 at 1-2 (citations omitted); Tr. at 24, 27-28) While it is possible that Mr. Rizzi could have been the only Robocast representative who participated in some such interactions, (*see* D.I. 55, ex. 3 at 511), the Court is not actually aware of any such specific communication where this was the case. And were there such communications, the third party would also be a source of information as to what occurred.

7.  With regard to Netflix's request for information relating to Mr. Rizzi's involvement in patent prosecution history-related matters, it is denied, and so the Motion is also GRANTED in this respect. Netflix has an inequitable conduct defense in the related case wherein it alleges that Mr. Torres and prosecution counsel Joseph Sofer took certain actions (e.g., Mr. Torres' submission of an allegedly false declaration) or failed to take certain actions (e.g., both men allegedly withholding material litigation documents) with the specific intent to

deceive the United States Patent and Trademark Office ("PTO") regarding the applications leading to certain of the asserted patents. (Civil Action No. 22-305-JLH, D.I. 160 at ¶¶ 67-92 (D. Del. Dec. 22, 2023)) Netflix also has a defense of prosecution laches, in which it alleges that Robocast and its prosecution counsel executed a strategy to delay prosecution of Robocast patents by filing a string of continuation applications for decades. (*Id.* at ¶¶ 95-108) Mr. Rizzi was not prosecution counsel, (Tr. at 31), and though he may have occasionally consulted with Mr. Sofer regarding prosecution issues, (D.I. 57, ex. H at 313-16; *see also* D.I. 55, ex. 8 at 2-4; D.I. 27, ex. 11 at 74), it is hard to discern how Mr. Rizzi would likely have *unique* knowledge that is *crucial* to these defenses, (D.I. 3 at 10; Tr. at 63). In its supplemental letter brief, the closest that Netflix came to alleging unique knowledge is an assertion regarding the inequitable conduct defense. There, Netflix notes that Mr. Torres spoke about the allegedly false declaration in a 2013 deposition that Mr. Rizzi defended; Netflix asserts that "[o]nly Mr. Rizzi can explain why he failed to notify the PTO that Mr. Torres's declaration was false, notwithstanding the duty of candor owed during patent prosecution." (D.I. 55 at 2; *see also* Tr. at 36) But even if Mr. Rizzi could be said to have unique knowledge about "why he failed to notify the PTO" of this alleged fact, Netflix has not sufficiently explained how any such knowledge would be relevant and crucial to the defense, and would be non-privileged. *See Layne Christensen Co. v. Purolite Co.*, Civil Action No. 09-2381-JWL-GLR, 2011 WL 1230332, at *3 (D. Kan. Mar. 29, 2011) (applying *Shelton* and denying the plaintiffs' request for a deposition of defendant's trial counsel in a patent case, in part because while the counsel had represented his client as to prosecution of foreign patent applications related to the asserted patent, the moving party had not sufficiently explained to the Court how those applications were relevant to questions regarding the validity of the patent-in-suit).

8. With regard to the motion for sanctions, the Court has reviewed the parties' arguments and the record, and it sees no basis to award any sanctions here pursuant to Rule 45(d)(1). Thus, that part of the Motion is DENIED. While the Court has granted the motion to quash, that was largely because the *Shelton* factors provide a very high bar to clear (and Netflix did not clear it). That said, Mr. Rizzi did play a role vis-à-vis Robocast over the last many years that seems different than the role your typical outside patent litigation counsel might play. (Tr. at 18-19) After all, he was a patent litigator who was also billed as a part of Robocast's "Management" team at times, (D.I. 2, ex. C at ROBO1481157), and he invested in the company at one point. You do not see that every day in the patent litigation sphere. So the presence of some of these unusual factors may have prompted Netflix to seek information in Mr. Rizzi's possession. Although Netflix did not ultimately prevail on that front, the Court does not agree with Petitioners that Netflix's subpoenas were "obviously improper[.]" (D.I. 3 at 16); *see also Goldberg v. Amgen, Inc.*, 123 F. Supp. 3d 9, 22-23 (D.D.C. 2015) (explaining that Rule 45(d)(1) does not require the court to impose sanctions merely because a party is unsuccessful in its subpoena, and that often such sanctions follow only where the subpoena was issued in bad faith or for some improper purpose); *Havens v. Mar. Commc'ns/Land Mobile, LLC*, Civ. No. 11-993 (KSH) (CLW), 2014 WL 2094035, at *5 (D.N.J. May 20, 2014) (noting that it "does not automatically follow that because the Court has quashed the subpoenas [the defendant] acted unreasonably in issuing or relying on them" and declining to impose Rule 45(d) sanctions, in part because certain recipients had not undertaken the cost or inconvenience of compliance)). Nor can the Court conclude that Netflix or its counsel failed to take "reasonable steps to avoid imposing an undue burden or expense on" Mr. Rizzi. Fed. R. Civ. P. 45(d)(1). The lead-up to service of the subpoenas on Mr. Rizzi appears to have involved some unusual circumstances, as

well as the exchange of some tough words between counsel for both sides. (*See* D.I. 2, ex. B) But the record does not clearly demonstrate that in serving those subpoenas, Netflix or its counsel engaged in any actions that were improper or otherwise went beyond the pale. (*See, e.g.*, D.I. 27 at ¶ 23; D.I. 17, ex. 14; *id.*, ex. 15; D.I. 15 at 20)

9.  For the reasons set out above, the Motion is GRANTED-IN-PART and DENIED-IN-PART, in that the motion to quash is GRANTED in its entirety and the motion for sanctions is DENIED.

10. Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **February 12, 2025** for review by the Court. It should be accompanied by a motion for redaction that includes a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: February 6, 2025

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE